## WILLIAM FIRMSTONE *vs.* EDWARD DE CAMP.*

1. Equity will correct a clear mistake in a written agreement, so as to conform to the understanding of the parties at the time of its execution.

2. The injunction which issued upon the filing of the bill, so far modified as to permit the defendant to proceed with his suit at law, but restraining him from setting up at the trial, any other construction of the contract than that adopted by this court.

---

This cause was argued on final hearing, upon the pleadings and proofs, before Beasley, Chief Justice, sitting for the Chancellor.

---

* This opinion was delivered at May Term, 1867. Though out of its chronological order, it has been thought advisable to publish it immediately following the opinion upon the motion to dissolve.

*Mr. Pitney,* for complainant.

*Mr. Vanatta,* for defendant.

BEASLEY, C. J., sitting as Master.

This bill is brought to reform an agreement, on the ground of mistake. The agreement in question is in writing, dated the 27th of November, 1863, and signed by the complainant and defendant. Its substance is a stipulation on the part of the complainant to sell to the defendant, who agrees to buy twenty-five hundred tons of good merchantable iron ore, for a certain price, "at the Ogden mine, Sussex county, New Jersey." The alleged mistake consists in the use of the designation "the Ogden mine."

It appears from the pleadings and proofs that, at the time of the inception of the agreement, the circumstances were these: the complainant was the owner of a mine and tract of land containing thirty-two acres, this mine was then filled with water, not having been worked for some years. It was in strictness known as "the Sharp mine," though it appears the complainant had never known it, or heard it, called by that name. Within about one hundred and fifty yards of this mine of the complainant, was another mine called "the Ogden mine," on a lot known as the seventy-five acre tract, which was the property of a Mr. Fell, but the mining operations upon which, were carried on in the name of the complainant. Both these mines were on the same vein of ore, and there was some evidence to show that each, by some persons, was called "the Ogden mine."

The insistment of the complainant is, that in the contract in question, by the expression "at the Ogden mine," he meant to refer to his own mine on the thirty-two acre tract; whereas, the defendant contends, that the designation applies, and was so understood by him, to the "Ogden mine" proper, on the seventy-five acre tract.

A careful collation of the evidence has led me to the belief that the complainant has fully established his case. There

are many minute facts and indications in the evidence upon which I shall not touch, as it would be tedious and unprofitable to do so, but which, nevertheless, have conduced to the formation of my opinion. A few of the more important particulars, which have had great weight with me, are these:

1. The draft of the agreement, in the hand writing of the defendant, I regard as entirely inconsistent with his present pretensions. This paper bears date on the 18th of November, 1863, and a few days after that date it was presented, by the defendant, to the complainant for his approval. This draft, like the agreement which was afterwards executed, and which is now in controversy, calls for the delivery of twenty-five hundred tons of merchantable ore "at the Ogden mine."

Now the question arises, how did the defendant come to draw a contract with that provision in it? for, on the hypothesis which the defendant has endeavored to support in the proofs, I confess that to my mind, this point presents an inscrutable mystery. The incongruity is here. The defendant, in his deposition, in the most explicit terms, alleges that the actual agreement between himself and the complainant, was that he should have the ore taken from the mine on the thirty-two acre tract, or from that on the seventy-five acre tract. On this head he is too clear to be mistaken. Speaking of the interview between himself and the complainant, he says: "I insisted upon having the 'Ogden mine' ore, as a part of the consideration of the seventy-five acre lot, at two and a half dollars per ton. He declined for a considerable time to do so, but afterwards stated that himself and Mr. Fell anticipated uniting the two lots and working them in partnership, and that, when they should do so, he would represent to Mr. Fell that he had made a verbal agreement with me, to the effect that I should have the said amount of ore from *any part of the two lots* that they should be working, and that it should be good merchantable ore." This proposition, he goes on to state, was accepted by him, and this arrangement, according to his alleged understanding,

was in no respect modified up to the moment when he presented himself to the complainant with the draft of the agreement in his hand. It will be observed, therefore, that the verbal agreement, as stated by the defendant himself, was that the ore should come from "any part of the two lots" that should be in working, while the draft of the agreement, made by the defendant, confines the right of delivery to one of the two lots. It is, I think, therefore demonstrably clear, that the defendant did not frame his draft of the agreement upon the model of the understanding testified to in his deposition, and which, he would have the court believe, had undergone no change. This paper, therefore, under the defendant's own hand, bears strong evidence against the version which he now seeks to put upon the transaction.

2. But, on the other hand, this same paper strongly corroborates the case made by the bill, and by the testimony taken in the cause on the part of the complainant. I attribute this effect to it, for the reason that, if we give to the expression "at the Ogden mine," the meaning for which the complainant contends, we have an agreement in the hand writing of the defendant, which is agreeable in every respect to that understanding which is attested to by the complainant, and which is in harmony with all the evidence, with the exception of the deposition of the defendant himself.

I have shown that the paper in question has no prototype in the arrangement between these parties, if we are to look for that arrangement in the testimony of the defendant. Let us see how it stands with respect to the opposite theory.

The complainant, in his deposition, thus expresses the substance of the interviews which preceded that in which the drafted agreement was brought to him. His words are: "He, the defendant, wanted five hundred tons of iron ore, and I told him I was not working my lot—I could not let him have it. That I could not start the lot to get out only five hundred tons. That, if he would take twenty-five hundred tons, I would see about starting it. He then said he

would consider on it, and let me know." And in a letter written by the complainant to his agent, Mr. Richards, and which is worthy of much consideration, as it shows the cotemporaneous views of the writer, he states the agreement to the same effect, as follows: " De Camp was on here again, Thursday. I told him I had no intention to start the mine, and certainly should not, to get out only 500 tons. That if I did not work the mine for five years, he would get no ore at all. That if he would take 2500 tons at $2.50 cash, I would start the mine, and take it out at the rate of 100 tons per week. He said he would let me know in a week or less." In addition to this piece of evidence, we have in the case a letter from Mr. Richards to the complainant, informing him that he had seen the defendant, who said he had concluded to accept the above mentioned offer. Those letters were not objected to before me as evidence, but were used by both parties on the argument, and they show with certainty what, at the time of the transaction, was the impression on the mind of the complainant, according to this version.

Here, then, was a distinct offer of the ore to be taken from the complainant's mine, in a certain time and in a given quantity; and in a few days afterward, the defendant presents to the complainant his draft of the agreement, which completely embodies and harmonizes with such offer, if we adopt the complainant's views touching the meaning of the denomination, " Ogden mine." Giving credence to the testimony of the complainant, and taking his definition of the terms descriptive of the mine, the draft of the defendant is a fair transcript of the agreement as attested on the side of the complainant. But if we believe the defendant, such draft contains a contract, which he, himself, does not pretend the complainant had ever assented to, at the time he committed it to paper.

In my apprehension, this evidence, standing alone, would be almost decisive. No explanation has been offered on this point. The defendant says, that in that last interview, the

complainant drew off the terms embodied in the final agreement, but he appears to have entirely forgotten that he, himself, had previously put in writing his own views of the understanding. What the complainant really did, was to put in pencil, on the back of the draft drawn by the defendant, the form of the contract, which was a modification of that framed by the defendant; the alterations consisting principally in the times of payment, and the introduction of a clause of forfeiture.

3. The testimony of Mr. Richards, with regard to what took place in his presence at the interview between these parties, where they both agree the final arrangement was made, is also most material. If that evidence is true, the case of the complainant is entirely established. I have looked carefully through the deposition of this witness, and have found nothing which tends, in any respect, to shake my confidence in either his intelligence or veracity. His statements, in many important respects, are confirmed by the letters which are exhibits in the case.

4. I also consider the conduct of the complainant immediately following the execution of this contract, as strongly indicative of the construction he put on the agreement. It is clearly shown that he proceeded at once to drain his mine and put it in working order. He gave instructions to his superintendent, to let the defendant have ore from the seventy-five acre tract until the ore could be taken from the mine in his own lot. I have said these arrangements were made and instructions given, as soon as the contract was executed. Why was this course taken? Are we to believe that upon signing this agreement, he immediately proceeded to take steps in fraud of it? It affirmatively appears that the complainant was under no legal obligation to enter into the agreement in question, and it seems, therefore, preposterous to attribute to him a design, almost cotemporaneous with the execution of such agreement, to lay measures to violate

it. And yet to sustain the defence, we must believe such an anomaly existed.

In view of the whole of the evidence, I conclude that in the agreement or controversy, the terms "Ogden mine" were intended to signify the mine on the lot of the complainant, and that they were understood in that sense by both the contracting parties. Nor in coming to this result have I overlooked the well settled rule of this court, that in a case of this nature the proof must be clear, so as to leave the mind free from all obscurity or doubt. In my opinion, the testimony before me, when carefully examined and weighed, leads the mind to this point and demonstration. Owing to the use of ambiguous terms of description, this contract, as it now stands, contains a stipulation which, at the time it was assented to, was aside from the intention of both the parties to it; and now, contrary to the justice of the case, one of such parties is endeavoring to take advantage of such verbal obscurity. It is obviously within the ordinary jurisdiction of this court, to prevent such an abuse. The contract should be rectified so as to import that the ore, forming the subject of the sale, is to come from the mine upon the lot of the complainant.

The injunction should be modified, so as to permit the defendant to proceed with his suit at law, if he deems such course advisable, and restraining him from setting up at the trial, any other meaning of the contract than the one above indicated.

As this case was argued on final hearing, I have no authority to sign a decree, but I hereby respectfully advise his honor, the Chancellor, to make a decree in conformity with the above views.